UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NAMOH, LTD.                           )
                                      )
          Plaintiff,                  )
                                      )    CIVIL ACTION NO.
     v.                               )    13-10032-DPW
                                      )
BOSTON WATERBOAT MARINA, INC.         )
                                      )
          Defendant.                  )


FINDINGS OF FACT AND CONCLUSIONS OF LAW
September 7, 2017

On August 30, 2011, the M/Y NAMOH struck a wooden piling
while backing into a berth provided by defendant Boston
Waterboat Marina, Inc. ("BWM").  This litigation ensued to
determine whether plaintiff Namoh, Ltd. should be held
comparatively at fault for the damages as a result of this
allision and to establish the damages, if any, for which BWM is
responsible.  Following a non-jury trial, I make these Findings
of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52.

**I. FINDINGS OF FACT**

*A.    The M/Y NAMOH and Her Intended Voyage*

The M/Y NAMOH is a 125 foot luxury motor yacht owned by
Namoh, Ltd.  The M/Y NAMOH is equipped with twin diesel engines
and two five-bladed propellers with diameters of 1300mm and a
weight of over five hundred pounds each.  The M/Y NAMOH is also
equipped with a sonar system manufactured by Wesmar that has a

display monitor at the helm station on the far port side of the vessel.

At the time of the allision, the two members of Namoh, Ltd. were Walter Homan and his father Frank Homan. Namoh is the semordnilap of Homan. The Homan family used the M/Y NAMOH both for personal pleasure and for commercial chartering. At the end of August, 2011, Walter Homan was travelling aboard the M/Y NAMOH with his family. On August 30, 2011, the M/Y NAMOH travelled from Camden, Maine to Boston, Massachusetts to meet Walter Homan's son and his girlfriend.

**B.    *The August 30, 2011 Docking***

On the evening of August 30, 2011, the M/Y NAMOH arrived in the Port of Boston. The vessel's Master, Captain Gregory Russell, contacted BWM seeking a dock berth. Captain Russell spoke with Christopher Cannon, the manager of BWM and a licensed captain himself, who directed Captain Russell to berth in "D" dock, a slip in which the M/Y NAMOH had previously berthed.

The M/Y NAMOH arrived at BWM at approximately 6:00 PM and prepared to berth in "D" dock. Captain Russell positioned the M/Y NAMOH to back into "D" dock with her starboard side to be tied to the berth. Captain Russell positioned himself on the wing station on the M/Y NAMOH's starboard side. From the wing station, the monitor for the sonar would not be visible.

Cannon, joined by his father Larry Cannon, was present at "D" dock in order to assist with the berthing process.

Approximately half to two-thirds of the way into the berth, the M/Y NAMOH experienced a sudden and violent shudder. The starboard engine shut down and Captain Russell ordered the crew to throw out lines in order to secure the vessel from drifting. He then called the engineer in the engine room to determine if the engine readings appeared normal. When the engineer confirmed that they did, Captain Russell restarted the starboard engine. Captain Russell reasonably believed either that a line had become wrapped around the propeller, which had caused the engine to shut down, or that whatever object the vessel had struck had been cleared out by the initial impact.

Following the same procedure, the M/Y NAMOH again backed into the berth. Cannon remained on "D" dock watching the berthing and he did not instruct or warn Captain Russell not to proceed. As the vessel backed in, she appeared to hit something hard and the starboard engine again shut down. The M/Y NAMOH was pulled into "D" dock using her mooring lines and deck winches.

At trial, Cannon testified that he believed the wing station was a proper place for Captain Russell to be during a berthing process. When asked whether he felt that Captain Russell had done anything improper while backing in the vessel,

Cannon said no.  When presented with his deposition and earlier interrogatories, Cannon confirmed that at the time he gave his deposition, he had also been of the view that Captain Russell did not operate improperly during the berthing process.[1]

BWM has admitted that it was negligent for failing to provide the M/Y NAMOH with a safe berth and admits that it breached its implied warranty of workmanlike performance to Namoh, Ltd.  I find that Captain Russell did not operate the M/Y NAMOH improperly during the berthing process and, more specifically, that he did not act unreasonably when he backed the M/Y NAMOH into the berth for a second time.  I find that any damage to the M/Y NAMOH while berthing at "D" dock was caused solely by BWM's admitted failure to maintain a safe berth and its failure to warn Captain Russell of an obstruction in "D" dock berth.

Following an initial inspection of the vessel immediately after the incident, which did not reveal any damage, Cannon told Captain Russell that BWM would schedule a diver to determine what the M/Y NAMOH had struck and to investigate whether the M/Y NAMOH's propellers had suffered any damage.  On August 31, 2011,

---

[1] I note that Thomas Hill proffered an expert opinion on behalf of BWM at trial that Captain Russell contributed to the M/Y NAMOH's damage by striking the obstruction a second time.  Hill opined that Captain Russell should have used the M/Y NAMOH's sonar to investigate the obstruction or he should have used the lines to haul the M/Y NAMOH into the berth.

BWM engaged Edward Redfield, a commercial diver, to inspect the M/Y NAMOH and the "D" dock berth.  Redfield inspected the M/Y NAMOH underwater and observed that two blades of the starboard propeller were bent at the tips.  Redfield found nothing remarkable with respect to the starboard running gear stabilizers, the hull, the port propeller, or the port running gear of the M/Y NAMOH.  Redfield took video and still photographs of the damage to the starboard propeller and Captain Russell viewed and recorded the video.

Later that day, Captain Russell engaged in a sea trial of the vessel in Boston Harbor.  During the sea trial, the M/Y NAMOH exhibited vibration.  When the vessel returned to BWM after the sea trial, Captain Russell and Cannon discussed the possibility of repairing the propeller at BWM by hiring a dive team to remove the propeller in the water.  BWM had no capacity itself to take the propeller off the M/Y NAMOH in the water in Boston and had never employed a facility previously to take a propeller off a vessel with the size and weight of the propeller on the M/Y NAMOH.

Ultimately, the decision was made to continue on to New York.  As Captain Russell explained, "I thought we had a better chance of doing [the repairs] down in New York with better facilities and better equipped . . . personnel."

But repairing the vessel was not the only motivation for the trip to New York; Captain Russell also hoped to "still try and maintain the owner's trip. There was – you know, that was the – that was the objective, to try and salvage some of his trip. And we felt that at some point that the propeller was going to have to come off and we'd have a better chance down in New York." Captain Russell believed there was a guest transition planned for New York, where some of the owner's guests would be departing and others would be arriving.

I find the M/Y NAMOH travelled for New York both to obtain repairs and to allow the M/Y NAMOH's owner to continue his trip as scheduled. I also find that it was not unreasonable for the M/Y NAMOH to depart from Boston to seek repairs.

## C.    *The Journey to New York*

The M/Y NAMOH travelled from Boston to New York, with stops in Newport, Rhode Island and Sag Harbor, New York. During the voyage, Captain Russell and his crew monitored the engine thrust shaft temperature and kept the M/Y NAMOH at a reduced speed. The M/Y NAMOH was run on both engines, with the starboard engine running at a reduced rate. On September 1, 2011, during the journey from Boston to Newport, the starboard engine was run at no higher than 550 RPMs and the thrust bearing temperature for the starboard engine never exceeded 131 degrees Fahrenheit. On September 2, 2011, during the journey from Newport to Sag

Harbor, the starboard engine was run at no higher than 550 RPMs and the thrust bearing temperature for the starboard engine never exceeded 132 degrees Fahrenheit.

On September 3, 2011, as the M/Y NAMOH travelled from Sag Harbor to New York City, the thrust bearing temperatures readings began to climb. The M/Y NAMOH's engine room visual inspection log indicates that at approximately 1 AM, the starboard engine was being run at 550 RPMs and the thrust bearing temperature for the starboard engine was 107 degrees Fahrenheit.[2] Over the next three hours, the starboard engine stayed at 550 RPMs, but the temperature readings increased to 122, 130, and 135 degrees Fahrenheit. At 4:15 AM, the log notes that two cups of oil were added to the starboard thrust

---

[2] The times listed across the top on this page of the log appear to have been changed. The subsequent changes do not completely conceal the earlier version of the times. In the earlier version, the entries began at 0000, then went to 0100, 0200, and ended at 0500. The entries as now presented start at 0100, then go to 0200, 0300, and end at 0600. At closing arguments, BWM argued that I should view these changes as an attempt by Namoh, Ltd. to cover up damage that occurred to the starboard engine on the trip from Sag Harbor to New York. I find no such nefarious motivation behind the changes made to the times on this questioned page of the engine visual inspection log. As BWM concedes, if I were to adopt the earlier version of the log, there would be no 0600 entry because the next page of the log begins at 0700 and bears no indication that it was changed. Under these circumstances, because the earlier version would make the chronological record incomplete and especially because the subsequent version appears to be a contemporaneous change to the log, I find the subsequent version accurately states the times at which the entries were made.

bearings.  Then, at 5:00 AM, the starboard engine was run at 950
RPMs and the thrust bearing temperature for the starboard engine
was 148 degrees Fahrenheit.[3]  At 6:00 AM, the starboard engine
was still being run at 950 RPMs and the thrust bearing
temperature for the starboard engine had increased to 152
degrees Fahrenheit.  At 7:00 AM, the starboard engine was run at
921 RPMs and the thrust bearing temperature for the starboard
engine was 163 degrees Fahrenheit.  At 8:00 AM, the starboard
engine went back down to 550 RPMs, but the thrust bearing
temperature for the starboard engine remained at 163 degrees
Fahrenheit.  At 9:00 AM and 10:00 AM, the starboard engine was
run at 720 RPMs and 770 RPMs respectively and the thrust bearing
temperature for the starboard engine was 155 and 156 degrees
Fahrenheit.

    In his testimony, Captain Russell recalled that the
temperature of the starboard engine thrust bearings "spiked"
during the trip from Sag Harbor to New York City; he believed
this indicated an issue with the bearings.  By the time the M/Y

_____

[3] BWM argues that if I read the entries in accordance with the
earlier version, the starboard engine would have reached 950
RPMs at 4:00 AM and the oil would have been added only fifteen
minutes later, which would show (according to BWM) that the
starboard engine bearing failed because the starboard engine was
run above idle.  I have adopted the subsequent version of the
time entries on the log.  However, even if I were to adopt the
earlier version of the time entries, I would find that it does
not constitute sufficient evidence to show that the M/Y NAMOH
aggravated her damage.

NAMOH reached New York City on September 3, 2011, Captain

Russell believed that the vessel's issues now extended beyond

the damage to the propeller and that the thrust bearings needed

to be inspected.[4]

---

[4] As to the M/Y NAMOH's journey to New York, I note Thomas
Hill opined the M/Y NAMOH should have been repaired in the water
at BWM or at a local yard closer to Boston than New York and
that it was unreasonable for the M/Y NAMOH to proceed to New
York.  He focused his analysis on the trip between Sag Harbor to
New York, relying on the September 3, 2011 engine room visual
log's readings that show that the starboard engine was run at
higher RPMs and that the thrust bearing temperature was
elevated.  He concluded that the journey, in particular the
period between Sag Harbor and New York, increased strain on the
starboard engine and exacerbated preexisting problems with the
M/Y NAMOH's starboard running gear.  Analyzing earlier entries
in the engine room visual log, including one from July 29, 2011,
Hill opined that both the starboard and port thrust bearing
assemblies were generating excessive friction before the August
30, 2011 incident.  The July 29, 2011 readings show the thrust
bearing temperature at 183 degrees Fahrenheit, which Hill opined
would exceed the general rule that moving machinery components
should not generate heat uncomfortable to touch.

On cross examination, Hill struggled to quantify the
magnitude of the damage sustained on the journey to New York.
He stated that bearing damage is progressive and that it can
only be judged by the end result.  He asserted again his view
that bearings, like all moving machinery, do not like high
temperature and that when the bearing surface reaches a
temperature where you cannot touch it, there is an indication of
friction, which in turn indicates ongoing damage to the
bearings.

I credit Hill's testimony insofar as he says an increase in
temperature indicates an increase in friction, but I do not
credit his conclusions on the magnitude of the damage sustained
on the journey to New York.  I do not adopt his categorical
underlying assumption that if machinery is too hot to touch,
then damage is necessarily occurring and I find his analysis
fails to explain in a nuanced and credible manner the precise
amount of damage, if any, the M/Y NAMOH experienced on the trip
to New York.

In New York City, divers from Underwater Construction Corporation were engaged to attempt to remove the starboard propeller from the M/Y NAMOH. Underwater Construction Corporation provided a written estimate on September 2, 2011 for removing the starboard propeller, transporting the propeller to its Staten Island facility, and coordinating transport of the propeller to the repair facility. Underwater Construction Corporation estimated the final bill for these services would be $2,200.00.

The divers from Underwater Construction Corporation were unable to remove the propeller and no other facility could be found in New York City to repair the M/Y NAMOH at that time. Namoh, Ltd. has not presented documentary evidence of the actual cost and payment for Underwater Construction Corporation's unsuccessful attempt. Namoh, Ltd. relies instead on the original estimate for a successful removal and a statement by Graeme Lord, the yacht manager of the M/Y NAMOH. As the yacht manager, Lord was not himself tasked with reviewing and paying invoices. Angus MacKenzie and Romy Barden, who worked with Lord at the yacht management company, handled the billing for repairs. It appears Lord's statement is based upon his review of the estimate. In the absence of other evidence establishing the amount billed and paid for the failed attempt to remove the propeller, I do not find Lord's statement credible; thus, I find

Namoh, Ltd. has not established the charges it incurred from Underwater Construction Corporation.

At this point, Captain Russell decided that the M/Y NAMOH should be hauled out for repairs, and Homan and his family disembarked in New York.  The M/Y NAMOH was then towed to Fairhaven Shipyard in Fairhaven, Massachusetts for repairs.

I find that Captain Russell's conduct following the incident at BWM was not unreasonable and did not aggravate the damage to the M/Y NAMOH caused by the allision.

### D.    *The Repairs at Fairhaven*

The M/Y NAMOH arrived at Fairhaven Shipyard on September 19, 2011 and remained there undergoing repairs until October 18, 2011.  Namoh, Ltd. was charged $23,800.00 for the tow from New York City to Fairhaven, but Namoh, Ltd. has reduced the recovery it seeks to $11,424.00 to reflect what it would have cost if the M/Y NAMOH had been towed directly to Fairhaven from Boston. Namoh, Ltd. was also charged $1,700.00 for shifting the vessel from the floating dock to the travel lift slip at Fairhaven Shipyard and $1,644.40 for the trip and tow survey.  The Fairhaven Shipyard hauled the M/Y NAMOH out, replaced the vessel's starboard shaft bearings and the starboard propeller

for $27,549.60.[5] Namoh, Ltd. also incurred expenses in the amount of $52,863.09 from Advanced Mechanical for its travel to and from Fairhaven Shipyard to work on the vessel's starboard propeller, ceramic covered seal sleeves, o-rings, and centrifugal components.

Namoh, Ltd. incurred other incidental expenses during the repairs at Fairhaven Shipyard. These included expenses in the amount of $5,300.00 for crew accommodations, reflecting the rental brokerage fee and rental property expenses for September and October, 2011, as well as $1,490.12 for Captain Russell's hotel accommodations in Fairhaven for various dates during the repair period in September and October, 2011. Namoh, Ltd. spent $690.80 for Captain Russell and a crewmember to travel to and from Florida to coordinate with Florida vendors concerning the vessel's repairs. Namoh, Ltd. spent $4,457.99 on rental vehicles for Captain Russell and the crewmembers in Fairhaven, as well as $593.81 on fuel for the rental vehicles. Namoh, Ltd. also incurred expenses for food and provisions for Captain Russell and the crewmembers of $5,099.47 during the repair period. While repairs at Fairhaven Shipyard were ongoing, Namoh, Ltd. hired diver Jared Carleton to inspect the "D" dock

---

[5] While at Fairhaven Shipyard, the M/Y NAMOH also had her portside shaft bearings repaired. Namoh, Ltd. has not sought recovery from BWM for those repairs.

berth at BWM.  He charged Namoh, Ltd. $3,600.00 for his
inspection.

Namoh, Ltd. also seeks overhead expenses for operational
management fees in the amount of $9,000.00 and project
management fees in the amount of $10,000.00.  The only evidence
supporting these figures consists of two conclusory paragraphs
in Lord's affidavit.  Because there was no evidence linking
these fees to the repair at issue, I do not find that these
charges were reasonably related to the repair.

In September 2011, Namoh, Ltd. incurred crew wages in the
amount of $31,055.97.  Namoh, Ltd. incurred the same amount of
crew wages in October 2011 for the time the M/Y NAMOH's
crewmembers were available in Fairhaven to assist with the
repairs.

I find that Namoh, Ltd. incurred $95,181.09 for repair
costs and towage charges and $83,344.13 for crew accommodations
and incidental repairs.  I find these charges reasonable,
necessary, and appropriate to the repair.

**E.    *The Journey to Florida and Repairs in Florida***

After the repairs in Fairhaven, the M/Y NAMOH travelled to
Fort Lauderdale, Florida.  The M/Y NAMOH often travelled to
Florida at this time of year to perform maintenance and to give
the crew a brief break.  In 2011, the M/Y NAMOH had been hauled
out in Fort Lauderdale for general maintenance in the spring.

While in Fort Lauderdale, the M/Y NAMOH's starboard propeller was reconditioned again at a cost of $3,144.00, for which Namoh, Ltd. was invoiced on November 21, 2011. At his deposition, Captain Russell explained that he felt the starboard propeller's condition after leaving Fairhaven still was not satisfactory and that the decision was made to repair the propeller again.

**F.    *The M/Y NAMOH's Charter History and Prospects***

Although the Homans use the M/Y NAMOH often as a pleasure vessel, they also charter the vessel. At trial, Walter Homan explained that:

> My family and I are fortunate enough to have the
> flexibility to use the boat around any particular charters,
> so it was always common knowledge and it came down from my
> dad that charters came first, and we would always be able
> to get off, fly home, fly back, and family personally use
> the boat when there wasn't any charters.

The M/Y NAMOH did not have any charters scheduled for September or October 2011 and Captain Russell testified that he anticipated the M/Y NAMOH would be in Florida for that time. Lord testified that once it became clear the M/Y NAMOH was going to undergo lengthy repairs in Fairhaven, he instructed Namoh, Ltd.'s charter broker to remove the vessel from its website and not to market the vessel for charter in September or October 2011. Lord also testified that charters can come in at the last minute in New England, a week or even a day before the charter's

commencement date, and that he expected September 2011 to be a good month for charters in New England.

In 2008, the M/Y NAMOH had two charters, the first in July and August and the second starting in December and going into January 2009. In 2009, the M/Y NAMOH had two charters, the first in May and the last in June, while in 2010 the vessel had three charters, the first in March, the second in April, and the third in December through January 2011 in the Caribbean. In 2011, the M/Y NAMOH had two charters, the first in July and the last in August. In 2012 and 2013, the M/Y NAMOH was not offered for charter because Frank Homan was dying of an illness and wanted additional time to enjoy the vessel. In 2014 and 2015, the M/Y NAMOH had two charters each year, with the charters occurring in April, November, December, and January and all taking place in Florida and the Caribbean. As of October 19, 2016, the M/Y NAMOH had six charters in 2016 and was in the process of completing her seventh charter, which included one charter in September. I find that any prospects of charter during the relevant period[6] are too speculative to make part of any damages award.

---

[6] In this connection, I note that Thomas Hill opined that no potential or real charter income was lost. He based his conclusion on Captain Russell's understanding that the vessel was to be used for recreational purposes for September and October 2011 and that the crew would be on break once the vessel reached Florida. He also relied on the fact that there was no

## II. CONCLUSIONS OF LAW

### A. Namoh Ltd.'s Comparative Fault for the Second Strike

As discussed above, BWM has admitted liability for the initial strike. It admitted it was negligent in failing to provide a safe berth, that it breached its implied warranty of workmanlike performance, and that its breach was the proximate cause of damages sustained by the M/Y NAMOH's starboard propeller. *See generally Sailor Inc. F/V. City of Rockland*, 428 F.3d 348, 351 (1st Cir. 2005) ("The wharf owner must exercise diligence to maintain its berths in a safe manner and to remove any 'dangerous obstruction' or warn of its existence."). As to liability, therefore, I must determine only whether Captain Russell was also comparatively at fault for the second strike.

While a wharf owner has a duty to provide a safe berth, "the vessel too must use 'ordinary care,' avoiding dangerous conditions that are known to the operator or are obvious." *Sailor Inc. F/V*, 428 F.3d at 351 (citing *Smith* v. *Burnett*, 173 U.S. 430, 433 (1899)). "'[W]hen two or more parties have contributed by their fault to cause property damage in maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault.'" *P.R. Ports Authority* v. *M/V Manhattan*

_____

charter agreement in place on the date of the incident and none scheduled for the weeks the M/Y NAMOH was being repaired.

*Prince*, 897 F.2d 1, 3 (1st Cir. 1990) (quoting *U.S.* v. *Reliable Transfer Co.*, 421 U.S. 397, 411 (1975)).

I conclude Captain Russell acted reasonably when he backed the M/Y NAMOH into the berth for a second time and that Namoh, Ltd. is not comparatively at fault. "A ship's master has considerable discretion, but it is not unbridled. . . . [A]n action will lie if he 'ma[kes] a decision which nautical experience and good seamanship would condemn as inexpedient and unjustifiable at the time and under the circumstances.'" *DiMillo* v. *Sheepscot Pilots, Inc.*, 870 F.2d 746, 748 (1st Cir. 1989) (quoting *The Lizzie D. Shaw*, 47 F.2d 820, 822 (3d Cir. 1931)). When there is a maritime accident, a captain's decisions "though wrong, judged by the result, do not require him to be held liable, if his decisions were those which a competent harbor pilot similarly situated might reasonably have made under the same circumstances. The law requires due care and skill, but not infallibility." *United Fruit Co.* v. *Mobile Towing & Wrecking Co.*, 177 F. Supp. 297, 302 (S.D. Ala. 1959).

As I have found, before the second strike, Captain Russell reasonably believed either that a line had wrapped itself around the propeller but was now clear or that the vessel had struck an object with sufficient force to push it away. The fact that Cannon testified that Captain Russell did not act improperly on the day of the accident further supports that finding. *Peoples*

17

*Natural Gas Co.* v. *Ashland Oil, Inc.*, 604 F. Supp. 1517, 1525-26
(W.D. Pa. 1985) (relying on testimony of dock's manager, "who
occasionally spotted barges himself" that "all experienced
pilots used the same docking procedure that [the captain] had
used" to conclude captain exercised due care). Of course, if
Captain Russell had made a different choice about renewing the
docking process, the second strike would not have occurred, but
"[t]he mere fact that a different course of action might have
avoided the accident is not sufficient to establish contributory
negligence." *Hurst* v. *City of Virginia Beach*, 1972 A.M.C. 2346,
2355 (E.D. Va. 1971). Captain Russell reasonably made a
decision, based on the information before him, that the
obstruction had likely cleared and that the M/Y NAMOH was in
adequate condition to continue berthing.

At times, and with varying degrees of conviction, BWM
contends that Captain Russell should have utilized the sonar on
board the M/Y NAMOH to determine what the obstruction in the
berth was. I do not have sufficient evidence before me to
determine the potential utility, if any, the sonar would have
had under these circumstances. More importantly, as discussed
above, I credit Cannon's testimony that the wing station was a
proper place for Captain Russell to be during a berthing process
and I find the monitor for the sonar was not visible from the
wing station. I conclude that Captain Russell is not at fault

for failing to use sonar during the berthing process, even after he encountered an obstruction in the berth.

Thomas Hill's opinion does not change my conclusion. His views on sonar are irrelevant to my conclusion since the monitor for the sonar would not be visible from the wing station and it was reasonable for Captain Russell to be on the wing station during berthing. Hill's opinion that it was unreasonable for Captain Russell to back in a second time contravenes the opinion of Cannon, an experienced captain in his own right who stands in an adverse position in this litigation and was a percipient witness of the incident. I credit Cannon's view of Captain Russell's actions. Indeed, even if there were a dispute between experienced captains about the reasonableness of Captain Russell's actions, I would maintain the conclusion that Captain Russell's decision fell within the range of discretion granted to captains under these circumstances. *DiMillo*, 870 F.2d at 748.

I conclude Captain Russell's decision is not one "which nautical experience and good seamanship would condemn as inexpedient and unjustifiable at the time and under the circumstances." *Id*. I conclude Namoh, Ltd. is not comparatively at fault for the second strike.

**B.    Damages**

Having determined that Namoh, Ltd. is not comparatively at fault for the second strike, I turn now to determining damages.

### 1.    Mitigation of Damages

BWM argues that Namoh, Ltd. failed to mitigate its damages by permitting the M/Y NAMOH to travel from Boston to New York then back to Fairhaven with a damaged propeller. "[M]itigation is in the nature of an affirmative defense." *Nevor* v. *Moneypenny Holdings, LLC*, 842 F.3d 113, 119 (1st Cir. 2016). BWM must prove both that Namoh, Ltd.'s conduct was unreasonable and that it had the consequence of aggravating the harm. *Tennessee Valley Sand & Gravel Co.* v. *M/V Delta*, 598 F.2d 930, 933 (5th Cir. 1979); *see also Ellerman Lines, Ltd.* v. *The President Harding*, 288 F.2d 288, 290 (2d Cir. 1961) ("It is not fatal to recovery that one course of action, reasonably open but not followed, would have avoided further injury whereas another, also reasonable and taken, produced it."). As to the first element, I must decide whether the conduct "falls within the 'range of reason,' not whether [the vessel] has chosen the most prudent course of action." *Mecom* v. *Levingston Shipbuilding Co.*, 622 F.2d 1209, 1214 (5th Cir. 1980) (quoting *Ellerman Lines, Ltd.*, 288 F.2d at 290.).

First, as I found above, it was not unreasonable for the M/Y NAMOH to travel out from Boston to seek repairs. After

20

having initial discussions about repairing the M/Y NAMOH in Boston, the decision was made, in large part by Captain Russell, that the M/Y NAMOH should proceed to a location that had better facilities and was more adequately equipped to repair a vessel the size of the M/Y NAMOH.  Captain Russell and the M/Y NAMOH's owners were reasonably concerned that BWM did not have the capacity itself to take the propeller off and that BWM had never employed a facility previously to take a propeller off that was the size and weight of the M/Y NAMOH's propeller.  I conclude the choice to depart Boston falls within the "range of reason" granted to the vessel.  *Mecom*, 622 F.2d at 1214.

Having departed Boston, the prudent and efficient course of action on this record would have been to proceed directly to Fairhaven.  The M/Y NAMOH, however, did not proceed directly to Fairhaven, but instead made her way farther down the coastline to New York, a destination that was expected to have adequate capacity to repair the M/Y NAMOH and was thought to be a more convenient spot from which the owners, their family, and guests could depart.  Wisely, Namoh, Ltd. does not seek recovery for the expenses incurred from the tows between Fairhaven from New York and instead seeks recovery for the costs associated with a hypothetical tow only from Boston to Fairhaven.

BWM argues that not only would it be unreasonable for Namoh, Ltd. to claim damages for traveling to New York, but also

that the operation of the M/Y NAMOH down to New York, in particular the period from Sag Harbor to New York, had the consequence of aggravating the harm. BWM points to the M/Y NAMOH's engine room visual inspection log from September 3, 2011, which shows that as the vessel travelled from Sag Harbor to New York, the thrust bearing temperatures rose from 107 degrees Fahrenheit to 163 degrees Fahrenheit, as well as to the testimony of Hill analyzing the log. As discussed above, I find that the thrust bearing temperatures did rise as listed in the log and I credit Captain Russell's characterization that the bearing temperatures "spiked" during this part of the journey.

Even if I were — in the absence of Namoh, Ltd.'s decision not to pursue damages for the extended New York leg of the journey —required to address whether the vessel mitigated damages properly when she travelled on from Fairhaven to New York and then back up to Fairhaven, I conclude that BWM has failed to meet its burden of showing that this action had the consequence of aggravating the harm. Beyond Captain Russell's description of the rise in temperature as a "spike," there is no credible evidence before me that quantifies either the physical damage inflicted by the journey or the monetary value of that alleged damage. As discussed above, I do not credit Hill's attempts to calculate the potential damage incurred on the voyage to New York. It is BWM's burden to produce evidence

demonstrating the extent to which the vessel aggravated the damage on the journey to New York. *See Bosnor S.A. De C.V.* v. *Tug L.A. Barrios*, No. CIV. A. H-81-2460, 1984 WL 1428, at *7 (S.D. Tex. Oct. 1, 1984) (defendants "did not meet their burden of showing the extent of the loss, and the impact on the scope of the harm" from plaintiff's allegedly unreasonable behavior because their estimate of damages "was pure speculation"); *Sutton River Servs., Inc.* v. *Inland Tugs Co.*, No. 82-5224, 1984 WL 1462, at *4 (S.D. Ill. Jan. 24, 1984) (defendants failed to prove failure to mitigate damages because they "presented no evidence concerning numerous cost factors" needed to determine the amount to reduce plaintiffs' damages). Without sufficient evidence to gauge the consequences of the increase in temperature, I conclude that BWM has not met its burden of proving failure to mitigate damages.[7]

---

[7] As I found above, I do not adopt the earlier version of the September 3, 2011 log entries that would show the starboard engine reaching 950RPMs at 4:00 AM and oil being added fifteen minutes later. Even if I were to read the log in that manner, I would still conclude that BWM has failed to meet its burden of proving failure to mitigate damages. It is true that "[o]ur admiralty jurisprudence is especially sensitive to the unexplained alteration of logbooks" and that "[s]uch alterations should give rise to a presumption the logbook contained entries adverse to the vessel's contentions at trial." *Otal Inv. Ltd.* v. *M.V. Clary*, 494 F.3d 40, 58 (2d Cir. 2007). Here, however, as I found above, the earlier entries are still somewhat visible under the subsequent changes and the subsequent changes appear to have been made contemporaneously. *The Silver Palm*, 94 F.2d 754, 762 (9th Cir. 1937) (noting the difference between alterations made at a later time "with long deliberation" and

2.  <u>Repair Damages and Associated Costs</u>

Namoh, Ltd. is entitled to recover damages. *Pinto* v. *M/S Fernwood*, 507 F.2d 1327, 1331-32 (1st Cir. 1974). ("The owner of the damaged vessel is entitled to sufficient damages to put his vessel into a condition as seaworthy and serviceable as before the collision."). "Other incidental costs paid during the course of repairs 'are also fully recoverable if reasonably incurred.'" *Am. S.S. Co.* v. *Hallett Dock Co.*, 862 F. Supp. 2d 919, 930 (D. Minn. 2012) (quoting 2 Thomas J. Shoenbaum, Admiralty and Maritime Law § 14-6 n. 12-n.21 (5th ed. 2011)).

I have found that Namoh, Ltd. may recover its towage charges and repair costs. For towage charges, Namoh, Ltd. is entitled to $11,424.00 for the cost of a hypothetical tow from Boston to Fairhaven, $1,700.00 for the cost of shifting the vessel from the floating dock to the travel lift slip at Fairhaven Shipyard, and $1,644.40 for the cost of the trip and

---

alterations made contemporaneously "in an original entry, where haste may explain changes, though even if then, it should [be] made by leaving the original, under the naval rule forbidding erasures . . .").  I am able to discern the earlier entries and therefore can determine that the adverse impact the earlier entries would have on Namoh, Ltd. would be minimal.  Even under its view of the September, 3, 2011 log, BWM still would not have shown the extent of the harm suffered on the journey to New York.  The log's account of the change in temperature and addition of oil alone, without credible evidence explaining the significance of these actions, does not demonstrate how much, if any, damage the M/Y NAMOH suffered from making the trip from Sag Harbor to New York.

tow survey.  For repair costs, Namoh, Ltd. is entitled to $27,549.60 for the work Fairhaven Shipyard performed on the starboard propeller and starboard shaft bearings and $52,863.09 for Advanced Mechanical's travel expenses.  The total recoverable towage charges and repair costs are $95,181.09.

I have also found that Namoh, Ltd. may recover certain incidental expenses.  Namoh, Ltd. is entitled to $5,300 for crew accommodations at Fairhaven, $1,490.12 for Captain Russell's hotel accommodations at Fairhaven, $690.80 for Captain Russell and a crewmember's trip to Florida to coordinate with vendors on the repairs, $4,457.99 for rental vehicles, $593.81 for fuel for the rental vehicles, $5,099.47 for food and provisions for Captain Russell and the crew, $3,600 for Carleton's inspection, $31,055.97 for crew wages in September 2011, and $31,055.97 for crew wages in October 2011.  The total recoverable incidental expenses are $83,344.13.

Reasonable overhead charges may also be recovered so long as they are related to the repair work performed.  *U.S.* v. *Peavey Barge Line*, 748 F.2d 395, 399-400 (7th Cir. 1984). Namoh, Ltd., however, has not provided sufficient evidence to support such a nexus and consequently, I will not assess overhead charges as damages.[8]

---

[8] Case law regarding operational and overhead expenses suggests that such expenses should be awarded only if they are linked to

I conclude that Namoh Ltd.'s damages in the amount of $95,181.09 for repair costs and towage charges and $83,344.13 for incidental expenses are reasonable and recoverable.  I will therefore award Namoh, Ltd. $178,525.22 in damages.

### 3.   Florida Repair Damages

I decline to award Namoh, Ltd. damages arising from the subsequent repairs in Fort Lauderdale invoiced on November 21, 2011.  The only evidence Namoh, Ltd. proffered to support BWM's liability for these repairs is the conclusory assertion by Captain Russell that the reconditioned propeller was not satisfactory.  Namoh, Ltd. does not appear to have challenged the quality of the repairs in Fairhaven and was confident enough with the reconditioning to permit the vessel to proceed to Fort Lauderdale.  There is insufficient evidence showing technical problems with the reconditioned propeller that can be related to the damage incurred at Berth D on August 30, 2011. Consequently, I conclude that the repairs in Fort Lauderdale are

---

the repair at issue.  *See, e.g., U.S.* v. *Peavey Barge Line*, 748 F.2d 395, 499-400 (7th Cir. 1984); *Avondale Indus., Inc.* v. *Int'l Marine Carriers, Inc.*, No. CIV. A. 90-4570, 1995 WL 46327, at *3 (E.D. La. Jan. 13, 1995), *aff'd*, 69 F.3d 535 (5th Cir. 1995) ("The Court was not made aware of any procedures assuring that the accuracy of the percentage as to the period of these repairs. In short, Avondale did not prove that its overhead figures were accurate as applied to this work performed in December, 1989, and January, 1990.").  Lord's conclusory statement that these costs were linked to the repairs is not enough.

too attenuated from the incident in Boston for Namoh, Ltd. to recover from BWM. *Marine Office of Am. Corp.* v. *M/V Vulcan*, 891 F. Supp. 278, 289 (E.D. La. 1995) (refusing to award damages for repairs made eight months after an accident in part because the expenses "would likely be incurred anyway, and could have been completed simultaneously with other repairs").

4. <u>Detention Damages</u>

I also decline to award Namoh, Ltd. detention damages because I conclude Namoh, Ltd. has not demonstrated that any charter profits "have actually been, or may be reasonably supposed to have been, lost." *The Conqueror*, 166 U.S. 110, 125 (1897). "[D]etention damages are available only upon proof of loss of commercial profits and not for loss of recreational use." *N. Assurance Co. of Am.* v. *Heard*, 755 F. Supp. 2d 295, 296 (D. Mass. 2010). The loss of commercial profits may include the loss of charter income from a pleasure boat. *Cent. State Transit & Leasing Corp.* v. *Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376 (11th Cir. 2000) (citing *The Conqueror*, 166 U.S. at 125)). For a vessel owner to prove detention damages:

> It is not necessary for him to show by direct evidence that he would have employed his vessel or his property during the period in such a way that earnings would have accrued to him. . . . It suffices if he shows a state of facts from which a court or jury can find that there was an opportunity for him to do so, and that he would probably have availed himself of it. *The N. Star*, 151 F. 168, 175 (2d Cir. 1907).

While I do not require that the vessel owner "prove the loss of a specific charter at a definite time and place" to show there was an opportunity for charter, I do require a showing that the vessel was "'active in a ready market.'" *Skou* v. *U.S.*, 478 F.2d 343, 346 (5th Cir. 1973) (quoting *Moore-McCormack Lines* v. *The Esso Camden*, 244 F.2d 198, 201 (2d Cir. 1951)). I have treated this showing as necessitating a demonstration here that there was a realistic potential the vessel would obtain a charter during the relevant time.

Namoh, Ltd. argues the vessel was active in a ready market, pointing to the vessel's charter history in the years both before and after the accident. When defining the "ready market" for chartering a pleasure craft, however, I may take into consideration practical factors, such as the passing of the seasons. *Compare The Conqueror*, 166 U.S. at 134 (taking judicial notice of the fact that "the yachting season in our northern waters practically comes to an end before the 1st of November") *with Hahlo* v. *Benedict*, 216 F. 303, 308 (2d Cir. 1914) (concluding that a vessel "would have been leased in June and July, just as she was leased in August" because "[t]he season was at its very height, and we cannot say that the proof was speculative in spite of a narrow market"); *see generally Skou*, 478 F.2d at 346 ("Demand is not always constant for all suppliers available."). The fact that a vessel was active in

the market of mid-summer chartering in New England does not necessarily mean she was or would be active in the market of early fall chartering in New England.

Here, the evidence presented to me shows that the M/Y NAMOH historically was not an active participant in the September and October charter market, either in New England or more broadly. Throughout the M/Y NAMOH's entire charter history, there has been only one September or October charter, which did not take place until September 2016. The M/Y NAMOH's 2011 charters took place in July and August. She had none scheduled for September or October of that year, and she was not chartered again until 2014.[9] Moreover, as discussed above, I credit Captain Russell's testimony that during September and October, the M/Y NAMOH generally travelled down to Florida in part to give the crew a break and that it was the owners' plan to take the M/Y NAMOH down to Florida in September 2011.

The testimony of Homan and Lord does not change my conclusion. Homan's assertion that "charter comes first" may establish the family's baseline attitude towards charter when there is no undue interference with ownership convenience, but

---

[9] I recognize the M/Y NAMOH was not offered for charter in 2012 and 2013 because Frank Homan was dying of an illness. Although a completely understandable decision, this hiatus illustrates that owner convenience was the determinative factor in defining the extent that the M/Y NAMOH functioned as active participant in the charter market.

it does not demonstrate that the M/Y NAMOH was active in the relevant charter market. Lord's testimony on the high probability of a last minute charter in September 2011 is unsupported by other evidence. He testified that a charter could be booked a week or even a day before departing, but there is no evidence of the M/Y NAMOH ever being booked on such short notice and no evidence, beyond Lord's assertion that I do not credit, that charters routinely were booked on such short notice in September or October in New England. Most importantly, his testimony is largely belied by the fact that throughout her entire history, the M/Y NAMOH has only once been chartered in September.

From this evidence, I cannot determine that charter profits "have actually been, or may be reasonably supposed to have been, lost" and therefore conclude that an award of detention damages would be compensating impermissibly for the "mere inconvenience arising from an inability to use the vessel for the purposes of pleasure." *The Conqueror*, 166 U.S. at 125, 133; *see also N. Assurance Co. of Am.*, 755 F. Supp. 2d at 296.

### 5. Prejudgment Interest

Prejudgment interest "will normally be awarded in admiralty, absent exceptional circumstances." *Clifford* v. *M/V Islander*, 846 F.2d 111, 113 (1st Cir. 1988) (per curiam). "Prejudgment interest is customarily conceived as the short term

time value of money; in this sense, it corresponds to the compensation for the loss of funds until judgment enters and execution on that judgment is available to a plaintiff." In re *ALEX C Corp.*, No. CIV.A. 00-12500-DPW, 2010 WL 4292328, at *15 (D. Mass. Nov. 1, 2010).

BWM argues that Namoh, Ltd. should recover no prejudgment interest because its damage claims are unreasonable and unsupported. As my conclusions make clear, I have largely determined otherwise. Although I do not conclude that detention damages were warranted in this case, I also conclude that Namoh Ltd.'s general claim for damages was not unreasonable. *Slupinski* v. *First Unum Life Ins*. *Co.*, 554 F.3d 38, 54 (2d Cir. 2009); *Zim Israel Navigation Co., Ltd* v. *3-D Imports, Inc.*, 29 F. Supp. 2d 186, 193 (S.D.N.Y. 1998) (awarding prejudgment interest after concluding "there is no evidence of unreasonable delay or dilatory tactics during the course of this lawsuit").

For its part, Namoh, Ltd. argues that it should recover prejudgment interest in accordance with Massachusetts law, which sets prejudgment interest rates at twelve percent. Mass. Gen. Laws ch. 231, § 6B. The goals of prejudgment interest awards in the federal courts generally, however, are "compensating for the loss of use of money" and "restoring a party to the condition it enjoyed before the injury occurred." *City of Milwaukee* v. *Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 196 (1995) (internal

quotations omitted). I find that an award at the state statutory rate here would go beyond those goals and would constitute a windfall for Namoh, Ltd. for a roughly six-year period during which the average annual rate for Treasury Bills has been 0.35%.

I calculate prejudgment interest based on the average annual rate for Treasury Bills during the prejudgment period because it is a methodology that "has been found not unreasonable as an acceptable average for a prejudgment period." In re *ALEX C Corp*, 2010 WL 4292328, at *15 (citing *Pimentel* v. *Jacobsen Fishing Co., Inc.* 102 F.3d 638, 640 (1st Cir. 1996)); *see also Central Hudson Gas & Elec. Corp.* v. *The TUG M/V SCOTT TURECAMO*, 496 F. Supp. 2d 331, 353-54 (S.D.N.Y 2007) (calculating prejudgment interest based on average annual rate of Treasury Bills rather than New York's statutory nine percent interest rate). The interest will commence from the date of the accident, August 30, 2011. *Ryan Walsh Stevedoring Co., Inc.* v. *James Marine Servs., Inc.*, 792 F.2d 489, 493 (5th Cir. 1986) ("[P]rejudgment interest on repair costs runs from the date of the accident even though the owner does not pay these costs until some later date."); *Hobson* v. *Guido Tugboat & Salvage Corp.*, No. CIV.A. 94-10222-RGS, 1997 WL 263735, at *6 n.15 (D. Mass. May 2, 1997). I calculate the prejudgment interest on the damage award compounded annually to be $3,785.20.

## III. CONCLUSION

For the reasons set forth more fully above, I award Plaintiff damages in the amount of $178,525.22 together with prejudgment interest of $3,785.20 based on the average annual rate compounded annually for Treasury bills from August 30, 2011 to the date of entry of judgment. The Clerk is hereby directed to enter judgment on the basis of this Memorandum of Findings of Fact and Conclusions of Law.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE